Filed 1/11/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Marriage of JOHN and ANNETTE PETERSON | B259322 |
| | (Los Angeles County Super. Ct. No. BD520273 ) |
| JOHN PETERSON,<br><br>    Respondent,<br><br>    v.<br><br>ANNETTE PETERSON,<br><br>    Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, B. Scott Silverman, Judge.  Affirmed.

Law Office of James T. Neavitt, James T. Neavitt, Cecilia Jimenez and Andrew L. Fowler for Appellant.

Brian M. Moore for Respondent.

**INTRODUCTION**

The parties present a legal question that has divided states across the country: When one spouse contributes to Social Security, which according to federal law is a spouse's separate property, and the other spouse participates in a state or local pension plan in lieu of Social Security, which according to state law is community property, how should a state court divide the parties' retirement benefits?

The trial court held that because the husband's Social Security benefits are separate property and the wife's county retirement benefits are community property, the Social Security benefits may not be considered and the county benefits must be divided equally between the parties. We agree and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

John and Annette Peterson were married on March 12, 1994, and they separated on February 17, 2010. John[1] is an attorney who works in private practice. Throughout the marriage, John contributed to Social Security through mandatory payroll deductions.

Annette, also an attorney, began working for the County of Los Angeles as a Deputy District Attorney in September 1994, and remained employed with the County throughout the marriage. Through her employment Annette became a member of the Los Angeles County Employees Retirement Association (LACERA) Plan E, which is a defined-benefit retirement plan. LACERA members do not contribute to the plan; only the County, Annette's employer, contributes. The amount of a LACERA member's benefits is determined by the member's age at retirement, amount of service credits, and final compensation. Annette began accumulating LACERA service credits as soon as she began working for the County. At the time of trial, she had more than 14 years of service credits under LACERA's Plan E.

LACERA members are barred from contributing to Social Security. Under the Windfall Elimination Provision of the Social Security Act, 42 U.S.C. § 415(a)(7), and the

---

[1] Following the parties' practice in their respective briefs, we refer to the parties by their first names and intend no disrespect.

Government Pension Offset, 20 C.F.R. § 404.408a(a), Annette is barred from receiving Social Security benefits, both individually and as the spouse of someone who contributed to Social Security.

Annette and John separated on February 17, 2010 and filed for divorce. They entered into stipulated judgments regarding the custody of their children and division of the community estate, with the exception of their retirement benefits. They agreed that under existing law, John's Social Security is separate property and Annette's LACERA benefits are community property. As a result of this classification, John is entitled to keep 100 percent of his Social Security benefits and half of Annette's LACERA benefits, while Annette is entitled to none of John's Social Security benefits and only half of her LACERA benefits. Annette argued below that the trial court should fashion an equitable division of the LACERA benefits to account for this disparity, while John argued that the trial court was compelled by federal law and Family Code section 2550[2] to divide the LACERA benefits equally.

The court below conducted a short trial to address how to divide the retirement benefits. Annette stated that the present value of her LACERA benefits is approximately $210,000 to $216,000, and the present value of John's Social Security benefits is $228,000. Annette also used an online calculator available from the Social Security website[3] to estimate the amount of Social Security benefits she would be entitled to receive had she participated in Social Security. She also presented evidence showing the amounts John and his employer contributed to his Social Security during the marriage. John does not dispute these facts.

In its order following trial, the court acknowledged the parties' agreement that John's Social Security benefits are separate property and Annette's LACERA benefits are community property. The trial court rejected Annette's argument that the court should fashion an equitable division of the LACERA benefits by either (a) requiring John to

---

[2] All further statutory references are to the Family Code unless otherwise indicated.

[3] See, e.g., https://www.ssa.gov/planners/benefitcalculators.html.

reimburse the community estate for the amount of Social Security contributions withheld from John's pay, and then dividing the assets, (b) allocating a portion of the LACERA benefits to Annette as separate property based on the present value of the Social Security benefits Annette would have accumulated had she been a Social Security participant, or (c) considering the present value of John's Social Security benefits when dividing the LACERA benefits to ensure the parties received roughly equal retirement benefits. The court held that considering John's Social Security benefits in dividing the LACERA benefits would amount to a "setoff" of John's Social Security, which is barred by federal law. Relying on *Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979) (*Hisquierdo*) and *In re Marriage of Cohen* (1980) 105 Cal.App.3d 836, 843 (*Cohen*), the trial court concluded that because John's Social Security benefits were his separate property and the LACERA benefits were community property, the "LACERA retirement benefits accumulated during marriage are subject to the mandate for equal division of Section 2550." The court added, "Thus, whether the result is inequitable or not, this court cannot adjust the division of [Annette's] LACERA benefits or deviate from the requirement of equal division."

Annette timely appealed.

## STANDARD OF REVIEW

Because the parties have reached stipulated judgments as to the marital estate aside from the parties' retirement benefits, the only question before the court is how to divide the retirement benefits. Annette urges us to find that the trial court may divide the LACERA benefits in a manner that is not technically equal, in order to account for John's separate Social Security benefits. Because Annette has presented a question of law based on undisputed facts, we exercise de novo review. (*In re Marriage of Siegel* (2015) 239 Cal.App.4th 944, 953; *Estate of Wilson* (2012) 211 Cal.App.4th 1284, 1290 ["The applicability of a statutory standard to undisputed facts and questions of statutory interpretation are questions of law that are reviewed de novo."].)

4

**DISCUSSION**

Annette asks us to consider equitable ways to divide the parties' retirement benefits so that John does not receive 150 percent of the parties' collective retirement (all of the Social Security and half of the LACERA benefits) while Annette receives no Social Security and just half of the LACERA benefits. She suggests three alternative remedies, as she did in the court below. First, Annette argues that the Social Security withholdings from John's income should be reimbursed to the community and divided along with the LACERA benefits. Second, Annette suggests that a portion of the LACERA benefits, equal to what she would have contributed to Social Security had she been a participant, be attributed to her as her separate property, just as John's Social Security is John's separate property. Third, Annette suggests that we order the trial court to determine the value of John's Social Security benefits as of the date of separation, assign an equal value of the LACERA benefits to Annette as separate property, and divide the remainder as a community asset.

John, on the other hand, argues that California and federal law are clear: Social Security is separate property under federal law, non-Social Security pensions are community property under California law, and California law requires community assets to be divided equally. As a result, John argues, his Social Security withholdings and benefits should not be considered, and the LACERA benefits should be divided equally. We agree that existing law compels this result, and affirm.

**A.      Pension benefits are community property under California law**

In California, pension benefits are viewed as "a form of deferred compensation for services rendered," and "an employee acquires a property right to pension benefits when he enters upon the performance of his employment contract." (*In re Marriage of Brown* (1976) 15 Cal.3d 838, 845.) "[I]f the right to retirement benefits accrues, in some part, during marriage before separation, it is a community asset and is therefore owned by the community in which the nonemployee spouse as well as the employee spouse owns an interest." (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 179.)

5

Non-financial contributions to pension benefits, such as the service credits Annette has accumulated under LACERA Plan E, are also community assets. "The service credit (and the pension component of the retirement allowance) are more correctly described as "'a form of deferred compensation for services rendered.'" (*In re Marriage of Skaden* (1977) 19 Cal.3d 679, 686.)" (*In re Marriage of Sonne* (2010) 48 Cal.4th 118, 125.) "To the extent that such a right derives from service during marriage before separation, it is a community asset." (*In re Marriage of Green* (2013) 56 Cal.4th 1130, 1134.)

The parties agree that under existing law, Annette's LACERA benefits that accumulated during the marriage are a community asset.

**B.    Social Security benefits are separate property under federal law**

1.    *Social security is separate property under federal law*

Although retirement benefits are generally community property under California law, federal law mandates that Social Security is separate property. "The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law." (*Viva! Intern. Voice For Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935.) California law on this issue is preempted.

The federal Social Security Act, "Title II, 49 Stat. 622, as amended, 42 U.S.C. § 401 et seq., is the Old-Age, Survivors, and Disability Insurance (OASDI) plan of benefits for elderly and disabled workers, and their survivors and dependents." (*Washington State Dept. of Social and Health Services v. Guardianship Estate of Keffeler* (2003) 537 U.S. 371, 375 (*Keffeler*).) The Act's anti-attachment provision, 42 U.S.C. § 407(a) (section 407(a)), states in full, "The right of any person to any future payment under this [subchapter] shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this [subchapter] shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law." "These legal terms of art refer to formal procedures by which one person gains a degree of control over property otherwise subject to the control of another, and generally involve some form of judicial authorization." (*Keffeler*,

6

*supra*, 537 U.S. at p. 383.) The Social Security Act therefore expressly limits the ability of courts to assign Social Security benefits in a legal proceeding.

In implementing various revisions to the Social Security Act, Congress has continued to specifically exempt it from state community property laws. For example, Social Security benefits are subject to state law obligations to pay child support or alimony (42 U.S.C. § 659(a)), so long as "alimony" does not include "any payment or transfer of property or its value by an individual to the spouse or a former spouse of the individual in compliance with *any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses*." (42 U.S.C. § 659(i)(3)(B)(ii) [emphasis added].)

Courts are in agreement that the anti-attachment provision bars Social Security benefits from being characterized as community property and divided in a dissolution proceeding. As this court held in 1980, "[S]ocial security benefits [are] not an asset of the community, [are] not subject to division, and cannot be recognized by any alternative provision employing a setoff." (*Cohen*, *supra*, 105 Cal.App.3d at p. 843; see also *In re Marriage of Kelley* (1976) 64 Cal.App.3d 82, 96 ["The scope and nature of OASDI benefits both preclude their characterization as deferred compensation and disclose a federal statutory scheme in conflict with state court action exercising jurisdiction to award benefits from or employee 'contributions' to OASDI as community property in dissolution of marriage."]; *In re Marriage of Hillerman* (1980) 109 Cal.App.3d 334, 341 [in creating OASDI benefit scheme Congress intended "to create a federal retirement benefit which is immune from division by state courts in marital dissolution proceedings."].)

The parties recognize this limitation, and Annette is making no direct claims to John's present or future Social Security benefits.

2.     *Federal law does not allow an "offset" of Social Security benefits*

One of Annette's proposed solutions for reaching an equitable division of the retirement benefits in this case is to characterize John's Social Security income withholdings as a community asset: "[T]he funds expended during the marriage from

earnings, used to acquire [the] right to Social Security benefits, should be reimbursed to the community and proportionately offset against the . . . LACERA Benefits. . . .” John argues that “Annette’s attempt to seek ‘reimbursement’ for contributions to the Social Security system is a direct infringement of the federal supremacy clause.” We agree that classifying the income that John contributed to Social Security as community property would amount to an offset against John’s Social Security benefits, which is barred by federal law.

A 1979 United States Supreme Court case, *Hisquierdo*, *supra*, 439 U.S. 572, addressed the concept of offsets to account for disparities between spouses in federal retirement benefits. *Hisquierdo*, which originated as a California dissolution case, involved retirement and disability benefits for those in the railroad industry under the federal Railroad Retirement Act. (*Id.* at p. 573.) The husband worked in the railroad industry for over 30 years and was eligible for retirement benefits under the Railroad Retirement Act. (*Id*. at p. 579.) The wife worked in a different industry and was entitled to Social Security. (*Ibid*.) In the dissolution proceeding, the wife argued that based on the duration of the marriage, she was entitled to about 20 percent of the husband’s retirement benefits. (*Ibid*.) A provision of the Railroad Retirement Act, similar to the anti-attachment provision of the Social Security Act, stated that benefits were not subject to “garnishment, attachment, or other legal process under any circumstances whatsoever. . . .” (*Id*. at p. 576, citing 45 U.S.C. § 231m.)

The California Supreme Court followed California community property law and held that because the husband’s retirement benefits resulted from his employment during marriage, the benefits were community property and should be divided as such. (*Hisquierdo,* 439 U.S., *supra,* at p. 580.) The United States Supreme Court reversed, holding that federal law preempted state community property law with respect to those benefits. Drawing parallels between the Railroad Retirement Act and Social Security, the Court held that “Congress carefully targeted the benefits created by the Railroad Retirement Act” (*id*. at p. 584) by determining the amount “appropriate to support an employee’s old age and to encourage the employee to retire.” (*Id*. at p. 585.) If a state

8

awarded those retirement benefits to a spouse, the Court held, it would "reverse the flow of incentives Congress originally intended." (*Ibid*.) The Court noted that Congress could have written a community property exception into the statute if it had desired, referencing the 1977 amendments to the Social Security Act that "facilitate garnishment for claims based on spousal support." (*Id*. at p. 587; see also 42 U.S.C. § 659(a).) Because there was no such exception in the Railroad Retirement Act, the Court would not read such a limitation into the statute.

The wife in *Hisquierdo* suggested that even if she were not entitled to receive the husband's Railroad Retirement Act benefits directly, she could nonetheless get "an offsetting award of presently available community property to compensate her for her interest in [the husband's] expected benefits." (*Hisquierdo*, *supra*, 439 U.S. at p. 588.) The Court rejected this approach, because awarding the equivalent of a share of the husband's benefits would have the same effect as awarding the benefits themselves. "An offsetting award . . . would upset the statutory balance and impair [the husband's] economic security just as surely as would a regular deduction from his benefit check." (*Ibid*.) Moreover, there were practical concerns with this approach, since the wife was only seeking a share of *expected* retirement benefits. If she were to receive those expected benefits in a divorce and then the husband were to die before retirement, the husband's "heirs or beneficiaries [would] suffer to the extent that the offset exceeds the lump-sum death benefits the Act provides." (*Id*. at p. 589.) The Court also noted that because Railroad Retirement Act benefits were not "anticipated" because they were not payable until a certain date, Congress could change the terms of the policy before the husband retired, resulting in a "multiple penalty on future recipients." (*Ibid*.) "By barring lump-sum community property settlements based on mere expectations, the prohibition against anticipation prevents such an obvious frustration of congressional purpose." (*Ibid*.)

Annette argues that John's contributions to Social Security were the equivalent of using community assets (income) to contribute to the improvement of individual property (Social Security benefits), and it is "unfair and inequitable to allow community funds to

9

be used for the economic benefit solely of John." Social Security withholdings from income, however, are not optional and were never available to the community—they were removed from John's pay before he ever received it. Employers are required by federal law to collect and pay such taxes. (See, e.g., 26 U.S.C. § 7202.) Because federal law mandated the withholdings that were intended to fund the Social Security system, and the marital estate never had the option of receiving John's Social Security withholdings as a result of federal law, we conclude that characterizing the withholdings as community property to which Annette is entitled would have the same effect as the offset barred by *Hisquierdo*. (See also *Cohen*, *supra*, 105 Cal.App.3d at pp. 842-843 [under *Hisquierdo*, "Social Security benefits . . . cannot be recognized by any alternative provision employing a setoff"].)

California law also does not support Annette's argument. Annette analogizes the situation to one in which community income is used to improve separate property. She cites *In re Marriage of Moore* (1980) 28 Cal.3d 366, 371-372, *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 436-440, and *Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1422, which hold that community contributions to the maintenance or improvement of separate real property are reimbursable to the community. Her argument falters, however, on the assumption that John's Social Security withholdings are community assets. Community assets are "all property, real or personal . . . acquired by a married person during the marriage." (§ 760.) Here, the parties never had the option to spend John's Social Security withholdings in any way other than on Social Security contributions because they were withheld directly from John's income as required by federal law. John therefore never "acquired" those funds, and they never became community property.

In addition, section 2640 states that "[c]ontributions to the acquisition of property" specifically do not include "payments made for maintenance, insurance, or taxation of the property." (§ 2640, subd. (a).) *In re Marriage of Moore*, *supra*, 28 Cal.3d 366, upon which Annette relies, specifically held that tax obligations on property should *not* be included in the determination of the community assets and debts: "Upon dissolution, it is

10

the court's duty to account for and divide the assets and the debts of the community. Payments previously made for interest, taxes and insurance are neither." (28 Cal.3d at p. 372.) We see no basis for treating federally mandated Social Security withholdings differently than other taxes.

We therefore will not consider John's Social Security withholdings as community property because such a characterization contravenes both federal and state law.

We recognize that many other jurisdictions have struggled with the issue of whether mere "consideration" of Social Security benefits in dividing a marital estate is preempted under the reasoning of *Hisquierdo*. The majority of jurisdictions allows some consideration of Social Security benefits in fashioning an equitable division of a marital estate. (See, e.g., *Smith v. Smith* (2015) MT 256, ¶ 19; *In re Marriage of Herald and Steadman* (2014) 355 Or. 104, 119-120 (*Herald*); *Johnson v. Johnson* (S.D. 2007) 734 N.W.2d 801, 808; *Depot v. Depot* (Me. 2006) 893 A.2d 995, 1002; *In re Marriage of Zahm* (1999) 138 Wash.2d 213, 223; *Mahoney v. Mahoney* (1997) 425 Mass. 441, 446; *In re Marriage of Boyer* (Iowa 1995) 538 N.W.2d 293, 293-294; *Harshbarger v. Harshbarger* (Ohio Ct. App. 2004) 158 Ohio App.3d 121, 125.) A minority of jurisdictions bars all consideration of Social Security benefits. (See, e.g., *Wolff v. Wolff* (1996) 112 Nev. 1355, 1363; *In re Marriage of Crook* (2004) 211 Ill.2d 437, 451; *Cox v. Cox* (Alaska 1994) 882 P.2d 909, 920; *Webster v. Webster* (2006) 271 Neb. 788; *Manning v. Schultz* (2014) 196 Vt. 38, 45.)

We need not address that issue here because, as discussed below, California law mandates the outcome in this case without regard to any consideration of John's Social Security benefits.

## C. California law requires that community property be divided equally

Annette argues that the court could have fashioned a more equitable award in two additional ways. First, Annette determined the amount she would have contributed to Social Security had she been a participant, and she argues that the court could have designated an equivalent portion of the LACERA benefits as her separate property. Second, Annette argues that an amount of LACERA benefits equal to the present value of

11

John's Social Security benefits could have been awarded to Annette as separate property, and the remainder of her LACERA benefits then divided as a community asset.

Annette's suggestions are not supported by California law. The Family Code does not allow courts to make unequal awards of community assets. Because the LACERA benefits are community assets, the court was required to divide the benefits equally.

As a general rule, Family Code section 2550 requires courts to divide a marital estate equally: "Except upon the written agreement of the parties, or on oral stipulation of the parties in open court, or as otherwise provided in this division, in a proceeding for dissolution of marriage or for legal separation of the parties, the court shall, either in its judgment of dissolution of the marriage, in its judgment of legal separation of the parties, or at a later time if it expressly reserves jurisdiction to make such a property division, divide the community estate of the parties equally."[4] "In satisfying this mandate, 'the court must distribute both the assets and the obligations of the community so that the residual assets awarded to each party after the deduction of the obligations are equal.' [Citations.]" (*In re Marriage of Walrath* (1998) 17 Cal.4th 907, 924.)

Annette cites a variety of cases from other states to support her position that the court may fashion equitable solutions. For example, in *Herald*, *supra*, the Supreme Court of Oregon affirmed the trial court's division of assets where the wife was part of the Civil Service Retirement System (CSRS) and did not participate in Social Security, and the husband participated in Social Security. "The [trial] court concluded that it would be unjust for husband to receive half of the value of wife's CSRS pension at her retirement

_____

[4] John argues that section 2610 also requires the LACERA benefits to be split equally. This statute provides that once a court determines each party's "community property share in any retirement plan," the court then has the power to make all "necessary and appropriate orders" to ensure that the party receives the full share awarded. (§ 2610, subd. (a).) The law was intended only to empower courts to ensure that benefits reached their intended recipients. (See *In re Marriage of Powers* (1990) 218 Cal.App.3d 626, 634-636.) The law has no bearing on how retirement assets are to be divided, and in cases involving multiple community assets, courts have broad discretion in how to award individual assets to effect a substantially equal division of the community estate. (§ 2601.) Section 2610 therefore does not support John's argument that retirement benefits must be divided equally.

and, at the same time, enjoy his own full share of Social Security benefits. The evidence showed that, if wife had used marital assets to pay into the Social Security system during the parties' marriage, she likely would have received a monthly Social Security benefit of $391.41, if she retired at age 62. Based on that evidence, the court provided in the judgment that, when wife reaches 62, husband's portion of wife's monthly CSRS annuity benefit will be reduced by that amount." (*Herald*, *supra*, 355 Or. at p. 107.) The Supreme Court of Oregon affirmed this division of assets, holding that "a court does not per se violate 42 USC section 407(a) by considering Social Security benefits in fashioning a just and proper property division." (*Herald*, *supra*, 355 Or. at pp. 119-120.)

Similarly, in *In re Marriage of Rockwell* (Wash. Ct. App. 2007) 141 Wash.App. 235 (*Rockwell*), the wife participated in CSRS and the husband contributed to Social Security. The trial court determined the value of Social Security the wife would have received had she also participated in Social Security, and ruled that the CSRS pension was 8 percent the wife's separate property and 92 percent community property. (*Rockwell, supra*, 141 Wash. App. at p. 240.) The Court of Appeals of Washington held that "the trial court properly considered and compensated for the Social Security benefits that [the wife] would have received, but for her federal pension." (*Id*. at p. 245.)

Annette also cites *Cornbleth v. Cornbleth* (Pa. Super. Ct. 1990) 397 Pa. Super. 421, where the husband participated in CSRS and the wife participated in Social Security. The Superior Court of Pennsylvania said that "to the extent part of [a] pension might figuratively be considered 'in lieu of' a Social Security benefit we believe that portion should be exempted from the marital estate." (*Cornbleth, supra*, 397 Pa. Super. at p. 425.) The court found that, "To facilitate a process of equating CSRS participants and Social Security participants we believe it will be necessary to compute the present value of a Social Security benefit had the CSRS participant been participating in the Social Security system." (*Id*. at p. 427) Many other jurisdictions have fashioned various solutions to compensate a spouse who does not participate in Social Security, thereby preventing an unequal award resulting from the federal mandate that Social Security be

13

deemed separate property. (See, e.g., *Kelly v. Kelly* (2000) 198 Ariz. 307 (*Kelly*); cases cited ante [at p. 13].)

The laws of other states, however, are distinguishable. Washington, for example, is a community property state, but the Court of Appeals in *Rockwell* noted that under Washington law, "the court is not required to divide community property equally." (*Rockwell*, *supra*, 141 Wash.App. at p. 243.) Arizona, another community property state, requires equal divisions of assets but allows for some variance: "The statute [Ariz.Rev.Stat. §25-318(A)] requires a substantially equal distribution of community assets in the absence of a compelling reason to the contrary. See *Hatch v. Hatch*, 113 Ariz. 130, 133." (*Kelly*, *supra,* 198 Ariz. at p. 309.) Another community property state, Louisiana, has addressed the issue in a statute: "When federal law or the provisions of a statutory pension or retirement plan, state or federal, preempt or preclude community classification of property that would have been classified as community property under the principles of the Civil Code, the spouse of the person entitled to such property shall be allocated or assigned the ownership of community property equal in value to such property prior to the division of the rest of the community property." (La. Rev. Stat. Ann. 9:2801.1.)

California, on the other hand, is unique in its approach to community property because it strictly limits trial court discretion. "[U]nlike virtually every other state, California has restricted judicial authority by requiring trial courts to divide the community estate equally between the parties, except for limited circumstances . . . which are inapplicable here." (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 87.) "[T]he court possesses no authority to divide the community estate between the parties other than equally." (*Id.* at p. 88.) Therefore, "except as otherwise agreed by the parties or specifically provided by statute, no trial court has discretion to divide the community estate unequally and if it does so, the trial court errs as a matter of law. (Fam.Code, § 2550.)." (*In re Marriage of Cooper* (2008) 160 Cal.App.4th 574, 580.) California law does not allow for the exercise of discretion Annette seeks.

14

Moreover, Annette's suggestions contravene the present ownership interests inherent in community property. "The respective interests of each spouse in community property during continuance of the marriage relation are present, existing, and equal interests." (§ 751.) Annette's proposals that we provide a portion of the LACERA benefits to her as her separate property fail to account for the fact that John has a present, existing, equal interest in those benefits. The trial court did not have authority to convert John's "present, existing, and equal" interest in the LACERA benefits to Annette's separate property based on equitable considerations not supported by California law.[5]

We sympathize with Annette's situation, and recognize that the result of California's strict policies on the division of property, intended to protect spouses (see § 2580), did not produce an equitable result in the situation before us. But it is not our role to change or defy California law. To do so would contradict the main purpose of California's community property principles: "[T]he spouse 'should not be dependent on the discretion of the court . . . to provide [him] with the equivalent of what should be [his] as a matter of absolute right.' [Citation.]" (*In re Marriage of Brown*, *supra*, 15 Cal.3d at p. 848.)

We also note that our Legislature is free to craft a statute similar to Louisiana's La. Rev. Stat. Ann. 9:2801.1, *supra*, which directs courts to assign a portion of community assets to one spouse when the other spouse's retirement plan is classified as separate property under federal law. In addition, members of Congress have introduced many

---

[5] This is not to say that a court must divide all community assets in kind in every case. When multiple assets are at issue, the court has broad discretion to fashion an apportionment of interests that is equitable under the circumstances of the case as long as it effects an equal division. (*In re Marriage of Gray* (2007) 155 Cal.App.4th 504, 514; § 2550.) With respect to pension rights, a court may usually exercise its discretion by determining the present value of community property rights in the pension "and award them to one spouse with offsetting community or other assets to the other (commonly called the cash out method), or it may divide the community interest in kind between the spouses, reserving jurisdiction to supervise future payments to each spouse." (*In re Marriage of Moore* (2014) 226 Cal.App.4th 92, 100.) Here, because only a single community asset is at issue, the court's discretion to fashion alternative methods of division is limited.

15

versions of a "Social Security Fairness Act" intended to amend the Government Pension Offset and Windfall Elimination Provision, which bars Annette from receiving any Social Security as a result of her government pension plan. (See, e.g., S. 484 [introduced Feb. 25 2009]; S. 2010 [introduced Dec. 2011]; H.R. 1332 [introduced April 1, 2011]; H.R. 1795 [introduced Apr. 26, 2013]; H.R. 973 [introduced Feb. 13, 2015].)[6] Whether California or federal law should be changed to address the challenges presented here is a legislative policy decision that is beyond the purview of this court.

Finally, it is within the parties' power to create a more equitable solution—even if the court may not do so. (See § 2550, allowing for an unequal division "upon the written agreement of the parties, or on oral stipulation of the parties in open court.")

## DISPOSITION

We affirm the trial court's ruling. Because John's Social Security is separate property under federal law and Annette's LACERA benefits are a community asset under California law, the trial court was correct in holding that it must divide the LACERA benefits equally. The parties are to bear their own costs on appeal.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

We concur:


WILLHITE, Acting P. J.


MANELLA, J.

---

[6] On July 16, 2015, the California Legislature passed Senate Joint Resolution No. 1, stating in part, "the Legislature of the State of California requests the Congress of the United States to pass legislation repealing the Government Pension Offset and the Windfall Elimination Provision from the Social Security Act." (2015 California Senate Joint Resolution No. 1, California 2015-2016 Regular Session.)

16